[Cite as *Culp v. Olukoga*, 2013-Ohio-5211.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

REBECCA CULP, EXECUTRIX OF       :
THE ESTATE OF FRANK MERRILL;
AND AN ADMINISTRATRIX OF          :
THE ESTATE OF BONNIE
MERRILL,                          :

     Plaintiff-Appellant,         :        Case No.   12CA3470

             vs.              :

CHRISTOPHER OLUKOGA, et al.,       :        DECISION AND JUDGMENT ENTRY

     Defendants-Appellees.        :

_____

APPEARANCES:

COUNSEL FOR APPELLANT:    Raymond deLevie,
                                2770 East Main Street, Suite 24,
                                Bexley, Ohio 43209

COUNSEL FOR APPELLEES    Kevin W. Popham and Gerald J. Todaro,
CHRISTOPHER OLUKOGA,     2075 Marble Cliff Office Park,
 M.D., AND SOUTHERN      Columbus, Ohio 43215
 OHIO SURGICAL
 ASSOCIATES, INC.:

COUNSEL FOR APPELLEE:    Steven M. Willard and Robert E. Dever,
SOUTHERN OHIO MEDICAL   602 Chillicothe Street, Suite 325,
CENTER:                        P.O. Box 1384,
                                  Portsmouth, Ohio 45662

COUNSEL FOR APPELLEES    Michael Romanello and Zachary Pyers,
PULMONARY CRITICAL      65 East State Street, 4th Floor,
CARE, INC., DR.   SADIQ      Columbus, Ohio 43215-4227
AL-NAKEEB, DR. AMMAN
GHANEM, DR. MURTHY
GOLLAMUDI, DR.   SAMER
KSEIBI, DR. E.M. SAAB,
AND DR. TRAVIS HODGDON:

CIVIL CASE FROM COMMON PLEAS COURT
DATE JOURNALIZED: 11-18-13
ABELE, J.

{¶ 1}　This is an appeal from a Scioto County Common Pleas Court summary judgment

in favor of Dr. Christopher Olukoga, Southern Ohio Surgical Associates, Southern Ohio Medical

Center, Pulmonary Critical Care, Inc., Dr. Sadiq Al-Nakeeb, Dr. Ammar Ghanem, Dr. Murthy

Gollamudi, Dr. Samer Kseibi, and Dr. E.M. Saab, defendants below and appellees herein.

{¶ 2}　Rebecca Culp, administrator of the estate of Bonnie Merrill, plaintiff below and

appellant herein, assigns the following errors for review:

FIRST ASSIGNMENT OF ERROR:

"BY ITS ENTRIES DATED DECEMBER 29, 2010 AND
DECEMBER 30, 2010, THE TRIAL COURT ABUSED ITS
DISCRETION BY (1) NOT EVEN CONSIDERING A
CONTINUANCE OF THE TRIAL DATE BASED ON THE
COURT'S STATED DESIRE TO KEEP A PERFECT RECORD
IN NEVER HAVING CONTINUED A TRIAL DATE PAST THE
SUPREME COURT'S 2-YEAR REPORTING PERIOD, AND (2)
THE COURT'S PROVIDING INFORMATION ABOUT THE
PRETRIAL ORDER, EX PARTE, TO COUNSEL FOR
DEFENDANT."

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT'S ENTRIES, BARRING PLAINTIFFS
FROM OFFERING ANY EXPERT'S [SIC] AT TRIAL, WERE
AN ABUSE OF DISCRETION BECAUSE (1) DEFENDANTS
WERE NOT UNFAIRLY SURPRISED AS THEY HAD BEEN
TOO BUSY FOR DEPOSITIONS UNTIL ONE DAY BEFORE
THE DEPOSITION CUTOFF DATE; (2) DEFENDANTS
RAISED THE ISSUE OF DISCLOSURE ONLY AFTER THEY
WERE UNABLE TO SANDBAG PLAINTIFFS BASED ON EX
PARTE ADVICE GIVEN BY THE COURT TO THE LOCAL
HOSPITAL; (3) WHILE PLAINTIFFS WERE NOT AWARE OF
THIS EX PARTE ADVICE, THEY STILL PROPOSED THAT
THE PARTIES EXCHANGE EXPERT REPORTS; AND (4) THE

COURT'S ATTITUDE WAS HOSTILE AND BIASED AGAINST PLAINTIFFS RIGHT AFTER THIS EX PARTE ADVICE WAS REVEALED IN OPEN COURT."

THIRD ASSIGNMENT OF ERROR:

"AFTER THE FIRST JUDGE STEPPED DOWN FROM THE CASE, THE COURT ERRED, BY ENTRIES DATED SEPTEMBER 7, 2011 AND NOVEMBER 23, 2011, IN NOT RECONSIDERING THE PRIOR ENTRIES, BASED ON AN INCORRECT APPLICATION OF THE LAW OF THE CASE DOCTRINE."

FOURTH ASSIGNMENT OF ERROR:

"THE COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS BECAUSE IT FAILED TO RECOGNIZE THAT THERE ARE INSTANCES, AS IN THE CASE AT BAR, WHERE A PLAINTIFF IS NOT REQUIRED TO OFFER EXPERT TESTIMONY IN A MEDICAL NEGLIGENCE CASE."

{¶ 3} On December 30, 2005, Dr. Olukoga performed a three-part surgery on seventy year-old Bonnie Merrill at Southern Ohio Medical Center (SOMC). Dr. Olukoga repaired a hiatal hernia, performed an anti-reflux procedure called a Nissen fundoplication, and removed Mrs. Merrill's gallbladder. Merrill encountered complications from the surgery, and sadly, on August 6, 2006, died.

{¶ 4} On February 6, 2007, appellant filed a complaint against Dr. Olukoga and Southern Ohio Surgical Associates. On August 6, 2007, appellant filed a separate complaint against the remaining appellees. Appellee later voluntarily dismissed both complaints and re-filed them as one complaint on January 7, 2009.

{¶ 5} On March 9, 2010, the trial court issued a pre-trial order that set the matter for trial on January 18, 2011. The court further ordered: "All discovery proceedings must * * * be

completed 60 days prior to the jury trial date" and "[c]ounsel are to exchange the names of their respective expert witnesses for trial, not less than 30 days prior to the trial date."

**{¶ 6}**   On March 10, 2010, Attorney Popham sent an email to the other attorneys involved in the case.   Popham's email questioned the trial court's pre-trial order that discovery be completed 60 days before trial, but experts need not be disclosed until 30 days before trial. Popham stated:

> "There is no way we can get experts deposed between Dec 18 and Jan 18–even if we weren't precluded by a discovery deadline.!!
> I guess that we should come up with a mutually agreeable schedule of our own[.]"

**{¶ 7}**   On March 24, 2010, Popham sent to the other attorneys a proposed "Agreed Entry" modifying the discovery deadlines.   The proposed entry required (1) appellant to disclose expert witnesses by June 30, 2010, (2) appellees to disclose expert witnesses by September 13, 2010, (3) all fact witnesses to be disclosed by November 5, 2010, and (4) all discovery to be completed by December 17, 2010.   Counsel for the other defendants approved of Popham's proposed agreed entry, but appellant's counsel, Attorney deLevie, did not approve.   DeLevie stated that he had

> "concerns about the proposed entry.   Judge Marshall ordered simultaneous disclosure of experts.   Also, your proposal gives defendants two months to depose perhaps three experts.   Plaintiff then gets two months to depose experts of three defendants.   How many experts do you expect to name?"

**{¶ 8}**   DeLevie suggested that the parties discuss modifying the schedule after they completed Rebecca Culp's deposition, scheduled for the end of May.

**{¶ 9}**   On April 12, 2010, SOMC's counsel, Attorney Willard, sent a letter to deLevie that stated:

"We have all been cooperative and allowed you to take numerous depositions and complete voluminous discovery.   I believe we are at the point in which the discovery deposition of your experts * * * needs to be undertaken. Please provide available dates at your earliest convenience for each of these experts."[1]

On April 16, 2010, PCC's counsel, Attorney Romanello, sent a letter to deLevie.   In it,

Romanello requested to schedule depositions of appellant's experts in May, June, and July.

Romanello stated:

"On a related noted, we still need to reach an agreement about the completion of all discovery before trial.   I recall that you did not like [Popham]'s proposal.   In light of that, I would like to know what you propose.
Obviously, we cannot be taking discovery depositions of either lay or expert witnesses up to 30 days before trial."

On April 19, 2010, deLevie sent an email to opposing counsel and stated:

"I do not recall having disclosed anyone as an expert. * * *
I agree we need to talk about the schedule.   I would suggest we do this after Becky Culp's deposition.
My concern * * * with [the] proposed schedule is that [Popham] seemed to suggest that the defendants have two months to depose my relatively few experts, and then I have the same amount of time to depose the many, many more experts who will be named by the three defendants.   To solve this problem, I hope that shortly after I tell you who my experts will be, hopefully by mid-June–and, there should be no surprises–that the defendants will tell me how many experts they expect to call.   At that point we can best set a schedule for all of the depositions[.]"

On May 6, 2010, Popham sent an email to the parties that stated:

"I believe that we still need to resolve the issue of a modified case management schedule.
Ray– since you were the only one to object to my proposal–why don't you come up with a schedule, circulate it via email and we can either respond or discuss at our next gathering."

---

[1] In fact, as of April 12, 2010, appellant had deposed twenty-one witnesses, not including the three that appellant had deposed in the prior cases that she filed.

DeLevie responded: "Let's talk on May 26.   Ok?"

{¶ 10}  On November 19, 2010, Attorney Willard, sent a letter to deLevie that requested

him to disclose expert witnesses "now so that we will not get caught short."

{¶ 11}  On December 2, 2010, the parties exchanged a series of emails, beginning with

deLevie.   DeLevie suggested that he send opposing counsel expert reports instead of deposing

experts.   Romanello declined deLevie's offer to exchange expert reports and stated:

> "You have been asked several time to name your experts so that we could
> take their depos before trial, but you have not responded to those requests.   Please
> name them and give us depo dates without further delay.   Why are you waiting to
> do so with a Jan. 18 trial date??   We are entitled to know who they are and are
> likewise entitled to their depos before trial.   When we have completed the depos
> of your experts, you may, if you wish, take your discovery depos on the defense
> experts.   My experts have not and will not prepare reports."

{¶ 12}  On December 2, 2010, Popham also sent deLevie an email regarding expert

witness disclosure:

> "You are relying on the March 8, 2010 trial order for the proposition that
> you will not make your expert witnesses available for discovery deposition prior
> to trial on January 18, 2011 because the trial order states that 'all discovery
> proceedings must also be completed 60 days prior to the jury trial date' despite the
> fact that the very same order provides that 'counsel are to exchange the names of
> their respective expert witnesses for trial, not less than 30 days prior to the trial
> date;' and that you have yet to provide defense counsel with the names of your
> experts–let alone deposition dates?
>         If I am correct in my understanding, your position is untenable.   By copy
> of separate emails, I will remind you that I made a proposal for an amended case
> management schedule to which you objected.   You also previously stated that the
> experts who gave affidavits were not necessarily the ones who would testify.
> You also previously agreed to make you[r] expert available."

DeLevie corresponded with Popham and wrote:

> "If I understand your email, I too am also open to trying to work out the
> logistics of discovery.   However, I am not sure if anyone else is.   I'll call you
> Sunday [sic] in the afternoon if that's OK.   Email me a number where you can be

reached.   By the way, how many experts do you have and in what areas?   I have had no information from anyone in this regard."

Popham replied:

"* * * [W]hy are we deliberating on which day [the expert witness disclosure deadline] falls?   Why don't we disclose our experts and get dates to get depositions completed.
* * * *
You indicated that you will call 4 experts. * * * Please identify them and get potential deposition dates.   This is only 4 depositions–we can surely get these first 4 depos scheduled.   Or do you not want to put your experts up for deposition without knowing that you can complete all defense expert depositions?"

{¶ 13} On December 8, 2010, the PCC defendants filed a motion to preclude appellant from introducing expert testimony at trial, or, in the alternative, to continue the trial date.   PCC asserted that appellant failed to identify the expert witnesses that appellant intended to call at trial, despite appellant's duty to seasonably supplement discovery responses in accordance with Civ.R. 26(E)(1)(b) and despite "repeated verbal requests to identify [appellant']s medical liability experts expected to testify at trial and to provide dates for the timely scheduling of their discovery depositions before trial."

{¶ 14} On December 9, 2010, appellant filed a memorandum contra and contended that appellees created the situation by failing to take depositions of appellant's experts before the discovery deadline passed.   Appellant asserted that "the parties never did agree to a schedule for these depositions" and claimed that appellees should have raised the matter well before November 18, 2010, one day before the discovery deadline.   Appellant argues that "[t]he matter just never came up from May 6 to November 18, 2010."   Appellant argued that she had until December 20, 2010 to identify experts and that she would do so by that date.

{¶ 15} On December 10, 2010, Olukoga filed a motion to preclude appellant from calling expert witnesses at trial due to appellant's failure to timely identify the experts, or alternatively, to continue the trial date.

{¶ 16} On December 13, 2010, appellant filed a memorandum contra Olukoga's motion. Appellant asserted that appellees "ignored [the] Pretrial Order that very clearly establishes a November 19, 2010 cutoff date for depositions and then they did not inquire about taking expert depositions until the evening of November 18, 2010." Appellant contended that appellant's counsel was not uncooperative and was ready to discuss a deposition schedule. Appellant claimed that appellees failed to broach the subject of a deposition schedule until November 18, 2010 and argued that appellees "made no mention of, nor request for, taking expert depositions for more than half a year, which seemed to go hand in hand with their difficulty in finding time for depositions sought by [appellant]."

{¶ 17} On December 13, 2010, PCC filed a reply memorandum. In it, they asserted that appellant "failed to address PCC's argument that the plaintiffs were under a continuing duty and obligation to supplement their discovery and provide the identity of their expert witnesses pursuant to Civ.R. 26(E)(1)(b)."

{¶ 18} On December 14, 2010, Southern Ohio Medical Center joined in Olukoga's and PCC's motions to preclude appellant from introducing expert testimony at trial, or alternatively, to continue the trial date.

{¶ 19} On December 17, 2010, appellant filed a memorandum contra SOMC's motion. Appellant questioned why appellees did not request the court to clarify its pre-trial order nine

months ago, when Popham first raised the issue, and why appellees never contacted appellant

after May 6, 2010 to discuss appellees' concerns with the discovery schedule.

{¶ 20} On December 17, 2010, the trial court held a hearing.   At the start of the hearing,

the court indicated that appellant "is here today seeking a continuance," to which appellant

responded that "it's their motion," meaning appellees'.   SOMC's counsel asserted that appellant

believed that expert witnesses did not need to be disclosed until 30 days before trial, even though

the pretrial order stated that discovery needed to be completed 60 days prior to trial:

> "In this case I think Plaintiff's [sic]—it's my understanding, are taking the position that the scheduling order indicates the discovery cutoff is 60 days prior to trial, and that expert witnesses don't have to be disclosed until 30 days prior to trial.
> THE COURT:   Well, that was obviously a typographical error and it should have been brought to my attention long before now.   That doesn't make any sense.
> MR. WILLARD:   I understand that, Your Honor, and—and I stand here to day [sic]—we did contact your office and we're told that's what the order was. And in—that was—that was while we were here at one time—Mr. DeLevie just looked at me and said something happened unethically.   That's not true.   That was brought to the Court's intention [sic] way back when we were here at a hearing.   So it obviously doesn't make sense, but the point of the matter—fact of the matter is, the way that the—the position that the Plaintiff's [sic] are not taking would preclude the Defendants completely from—at all deposing their experts, which I think is inappropriate."

Appellant's counsel stated:

> "Thank you, Your Honor.   I'm really not sure where to begin. What—what really strikes me is that I now hear for the first time from the Court and also from Mr. Willard, that the Courts [sic] order upon which I have relied on, and I'm going to explain to you in a minute how we were relying on it.
> THE COURT:   Well, you had to know that was wrong.
> MR. DELEVIE:   No.
> THE COURT:   My God, how long—how many years have you been practicing law?
> MR. DELEVIE:   Here's why I knew—
> THE COURT:   Did they propose to you to amend that order and you refused to amend it?   You knew that order was not right.

MR. DELEVIE:   No.

THE COURT:   How many years have you practiced law?

MR. DELEVIE:   Since 1991.   I did not know that this order was not right, because there were issues presented to me—they said—

THE COURT:   How in the heck are you supposed to be able to do depositions of experts within 30 days of trial?

MR. DELEVIE:   --because if I had known—

THE COURT:   You know that was wrong.

MR. DELEVIE:   No.   Because apparently they knew there was a typographical error.   Nobody—

THE COURT:   And you did, too.

MR. DELEVIE:   --no, I didn't, absolutely not.

THE COURT:   Bologna.   Have you ever seen an order like that in your entire life?

MR. DELEVIE:   Like your order?

THE COURT:   Yeah.

MR. DELEVIE:   Yes.

THE COURT:   No.

MR. DELEVIE:   That is what I have relied on, Your Honor.   I have relied on your order as being an order that has said the parties need to cooperate among themselves.   I have relied on this order as saying—

THE COURT:   You've had this case for five years and you never disclosed an expert until yesterday.

MR. DELEVIE:   Let me explain exactly why.   Because there have been any number of documents in—in the file where I have requested depositions and was told there was no time.   There was no time from May—

THE COURT:   Is it true that the first time you told these gentlemen of your experts was yesterday?

MR. DELEVIE:   Yes, it is, Your Honor.   I'd like to continue if I might?

THE COURT:   Go.

MR. DELEVIE:   Because we relied on this order as requiring cooperation between the parties.   There was initially a question that said that we don't understand the order, and I was ready and wanted to sit down with them and there are emails all through there that says, 'Lets [sic] get together and lets [sic] talk.'   I was available to talk.   Nothing ever was said for six months while I was constantly going to them trying to set up depositions.

In May I was told—or in June I was told, 'We don't' [sic] have any time until the end of September.'   Then, I was told Mr. Willard's schedule was jammed up until the end of December.   There was no time.   I was trying to get dates set and I was relying on the Courts [sic], which no one had told me was a typographical error.   However, apparently Mr. Willard knew because he called your office and said it was a typographical error, and no one said that to me. They were certain that there was a typographical error.   And if that was so, then I think in all fairness I should have been told that also, because I was relying on the

order to say, 'It's up to the parties to cooperate.'   There was no specific order that said, 'You do this by this date; you do this by this date; you do this by this date.' The only clear orders were that there was an end point for doing depositions and then afterwards we would select among those and report to the Court whose—who were going to be our experts.   All we needed was dates.   I was trying to get dates for six months.   And I was told on any number of occasions and the emails are in there, 'We don't have dates.'   I was trying to get dates in the sense of, 'Well, we'll have Ms. Culp available on such and such date; can you have people available.'   I was not able to get dates.   I relied on this order. Nobody said to me it was a typographical error.   Nobody said that.   I relied on the order in good faith.   And it's really shocking to me to hear now that somebody who's pressing these motions, called into the Court's office and was told there was a typographical error, but no one said that to me.

THE COURT:   Were you sent a proposed order as this gentlemen has just said, and you refused to sign it?

MR. DELEVIE:   They sent me a proposed order and I refused to sign it for this reason, because it would have jammed me and not given me the time. They—

THE COURT:   Well, what have you put them into?

MR. DELEVIE:   --I was willing to talk to them.   They—

THE COURT:   You have put them into a jam, because they cannot depose your experts because you waited until yesterday to disclose them.

MR. DELEVIE:   No.   I came to try and set up depositions with them. And Your Honor, in the motion—in the piece of paper that Mr. Romanello handed to you, he says, 'Well, perhaps the reasons we didn't try and get depositions set, which I was trying to do, I was desperately trying to do that, is because of these health reasons.'

If they had done on June 1st exactly what they're doing at the very last day here, we wouldn't be here.   And why shouldn't they have done that on June 1st, because they had knowledge from the Court that I didn't know that there was a typographical error. What really strikes me now, Your Honor, its [sic] exceptionally unfair—is I got an email from one of the Defense counsel whose not here on December the 7th, I think it was, that said, 'Obviously this is a typographical error.'   They all knew that.   If I knew there was a typographical error and that we had a disclosure date when you're now saying it is, we would have complied with that.

THE COURT:   You've had this case for five years.

MR. DELEVIE:   We had—

THE COURT:   It is the order of this Court the expert testimony is precluded pertaining on this case. * * *"

{¶ 21} The court thus granted appellees' motions to preclude appellant from introducing

expert testimony at trial.

{¶ 22} Later, all appellees filed summary judgment motions and asserted that appellant's inability to present expert testimony is fatal to her case. Appellees argued that in order to present a prima facie medical negligence claim, a plaintiff must present expert testimony to support an allegation that a physician fell below the applicable standard of care. Appellees thus contended that because the trial court precluded appellant from introducing expert testimony, appellant could not present a prima facie medical negligence claim.

{¶ 23} On January 3, 2011, appellant filed an affidavit in the Ohio Supreme Court and sought to disqualify Judge Marshall from continuing to hear the matter. On March 17, 2011, Judge Marshall recused himself.

{¶ 24} On April 6, 2011, appellant filed a motion that requested the new trial court judge to reconsider and vacate Judge Marshall's order that precluded appellant from introducing expert testimony.

{¶ 25} On April 25, 2011, the Ohio Supreme Court assigned Judge W. Richard Walton to preside over the matter. On September 7, 2011, the trial court denied appellant's motion to reconsider Judge Marshall's ruling that precluded appellant from introducing expert testimony. The court stated:

> "From [appellant's] own argument, [appellant], rather than simply stating who [t]he experts would be, stated that he was willing to talk about it. [Appellant] would 'like to set something up.'
> [Appellant] had a duty to disclose the name(s) of [appellant's] experts. He did not do that until just before the December 2010 hearing. [Appellant] could have disclosed his expert(s) at any time."

{¶ 26} In reaching its decision, the trial court also appeared to rely upon the "law-of-the-case" doctrine and stated that, although the doctrine ordinarily applies to a reviewing court's decision, "[i]t is not restricted to that situation. A decision made by one judge also becomes the law-of-the-case which ordinarily must be followed in the same court in the same or

similar proceedings involving the same parties."   The court further stated, however, that the

doctrine "is not a hard and fast rule that is chiseled in stone."   The court explained:

> "A reviewing court or judge must view what has transpired and determine if there was any prejudicial error or an abuse of discretion by the original judge. The Court sees no bias or obvious error herein.   The same is true in regards of prejudicial error or an abuse of discretion."

{¶ 27}  On September 12, 2011, appellant filed a motion that requested the court to

reconsider its September 7, 2011 decision.   Appellant asserted that the court incorrectly relied

upon the law-of-the-case doctrine and did not consider the arguments appellant raised in the prior

motion to reconsider.

{¶ 28}  On November 23, 2011, the court denied appellant's second motion to reconsider.

{¶ 29}  On January 6, 2012, the trial court determined that appellant's inability to present

expert testimony is fatal to her case and entered summary judgment in appellees' favor.   This

appeal followed.

I

{¶ 30}  Because appellant's first and second assignments of error both assert that the trial

court abused its discretion when it imposed discovery sanctions, we consider them together.

{¶ 31}  In her first assignment of error, appellant contends that the trial court abused its

discretion because it failed to consider whether a continuance would be a more appropriate

sanction.   Appellant argues that the trial court did not consider whether to grant a continuance

because of the trial court judge's policy not to exceed the Ohio Supreme Court's recommended

two-year guideline.   Appellant additionally argues that she complied with the literal terms of the

trial court's pretrial order regarding disclosure of experts, yet the trial court sanctioned her before that deadline had passed.

{¶ 32} In her second assignment of error, appellant argues that the trial court abused its discretion by precluding her from presenting expert testimony at trial (1) when appellees' counsel informed appellant's counsel that they "had been too busy for depositions until one day before the deposition cutoff date," (2) when appellees' counsel attempted to "exploit the ex parte advice that the trial court judge provided [counsel for SOMC]," (3) when appellant had proposed that the parties exchange expert reports instead of conduct depositions, and (4) when the court exhibited a "hostile and biased" attitude towards appellant.

A

STANDARD OF REVIEW

{¶ 33} "The discovery rules give the trial court great latitude in crafting sanctions to fit discovery abuses." Nakoff v. Fairview Gen. Hosp., 75 Ohio St.3d 254, 662 N.E.2d 1 (1996). Thus, "[a] reviewing court's responsibility is merely to review these rulings for an abuse of discretion." Id. "'The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, unconscionable, or arbitrary.'" Blakemore v. Blakemore, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983), quoting State v. Adams, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). To find an abuse of discretion, "'the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias.'" Vaught v. Cleveland Clinic Found., 98 Ohio St.3d 485, 2003-Ohio-2181, 787 N.E.2d 631, 13, quoting Nakoff, 75 Ohio St.3d at 256.

{¶ 34} In the case at bar, we do not believe that the trial court's decision to preclude appellant from introducing expert testimony at trial, rather than continuing the trial date, as a sanction for violating Civ.R. 26(E)(1)(b) constitutes an abuse of the court's discretion.

B

CIV.R. 26(E)(1)(b)

{¶ 35} Civ.R. 26(E)(1)(b) requires a party to seasonably supplement responses to any questions directly addressed to "the identity of each person expected to be called as an expert witness at trial and the subject matter on which he is expected to testify." "This duty * * * is necessary because preparation for effective cross-examination is especially compelling where expert testimony is to be introduced." Shumaker v. Oliver B. Cannon & Sons, Inc., 28 Ohio St.3d 367, 370, 504 N.E.2d 44 (1986), abrogated on other grounds in State v. D'Ambrosio, 67 Ohio St.3d 185, 616 N.E.2d 909 (1993).

{¶ 36} The purpose of the discovery rules "'is to prevent surprise to either party at the trial or to avoid hampering either party in preparing its claim or defense for trial.'" Huffman v. Hair Surgeon, Inc., 19 Ohio St.3d 83, 86, 482 N.E.2d 1248 (1985), quoting Jones v. Murphy, 12 Ohio St.3d 84, 87, 465 N.E.2d 444 (1984) (Brown, J., dissenting). "This is accomplished by way of a discovery procedure which mandates a free flow of accessible information between the parties upon request, and which imposes sanctions for failure to timely respond to reasonable inquiries." Jones v. Murphy, 12 Ohio St.3d 84, 86, 465 N.E.2d 444 (1984). "If discovery is to serve its purpose, the parties must be entitled, upon the unveiling of a contention, to a reasonable opportunity to prepare to defend against it." Waste Mgt. of Ohio v. Mid-America Tire, Inc., 113 Ohio App.3d 529, 533, 681 N.E.2d 492 (1996), citing Shumaker, 28 Ohio St.3d at 371.

{¶ 37} A trial court may exclude expert testimony as a sanction for violating Civ.R. 26(E)(1)(b). E.g., Shumaker, 28 Ohio St.3d at 370, 504 N.E.2d 44; Huffman, 19 Ohio St.3d at

84; Jones v. Murphy, 12 Ohio St.3d 84, 465 N.E.2d 444 (1984) Wright v. Suzuki Motor Corp., Meigs App. Nos. 03CA2, 03CA3, 03CA4, 2005-Ohio-3494, ¶64.   However, the "[e]xclusion of otherwise reliable and probative evidence is an extreme sanction for a discovery violation." Wright at ¶65, citing Cucciolillo v. East Ohio Gas Co., 4 Ohio App.3d 36, 38, 446 N.E.2d 175 (1980); Mulford v. Columbus & S. Ohio Elec. Co., Athens App. No. CA-1548 (Jan. 12, 1994). "Thus, a court should exclude evidence only when clearly necessary to enforce willful non-compliance or to prevent unfair surprise."   Wright at ¶65.   "Where the undisclosed testimony of an expert witness creates substantial likelihood of surprise and there is an indication that one party deliberately disrupts the free flow of information between the parties, the trial court must either exclude such testimony or allow the other side time to find and present rebuttal testimony."   Earl Evans Chevrolet, Inc. v. Gen. Motors Corp., 74 Ohio App.3d 266, 282, 598 N.E.2d 1187 (1991)

{¶ 38}  In deciding whether to exclude evidence, "the trial court should weigh the conduct of the party offering the expert witness along with the level of prejudice suffered by the opposing party attributable to the discovery violation, in order to determine the appropriate sanction." Savage v. Correlated Health Serv., Ltd., 64 Ohio St.3d 42, 55, 591 N.E.2d 1216 (1992).   "The existence and effect of prejudice resulting from noncompliance with the disclosure rules is of primary concern, not just the intent or motive involved."   Huffman, 19 Ohio St.3d at 85.

{¶ 39}  In Huffman, for example, the Ohio Supreme Court determined that the trial court's decision to preclude the defendants from presenting expert testimony at trial when the defendants did not inform the plaintiffs that they would be calling an expert witness until four days before the trial did not constitute an abuse of discretion.   In doing so, the court rejected the appellate

court's conclusion that the trial court "should have considered 'other means of remedying unfair surprise * * * e.g., granting a continuance so that [the plaintiffs] could depose [the] defendant's expert." Id. at 84.

{¶ 40} In Vaught v. Cleveland Clinic Found., 98 Ohio St.3d 485, 2003-Ohio-2181, 787 N.E.2d 631, the court likewise determined that the trial court did not abuse its discretion by precluding the defendants from presenting expert testimony at trial. In Vaught, the plaintiff's interrogatories requested the defendants to "[i]dentify any and all expert witnesses you intend to call at the Trial of this matter including the specialty area and anticipated area or subject matter of the testimony." Id. at ¶5. The defendant-physician responded, "Currently under consideration. This Answer will be amended as required by the Ohio Rules of Civil Procedure, Local Rules of Court or Court Order." Id. The defendant-physician never supplemented his response.

{¶ 41} The trial court set a deadline for the parties to submit expert reports. The defendants did not submit any expert reports before the deadline. Instead, one week before trial, the defendants filed a brief that listed the defendant-physician as an expert witness. The plaintiff filed a motion in limine to exclude the defendant-physician's testimony, that the court granted.

{¶ 42} The defendants appealed and asserted that the trial court's decision to exclude the expert constituted an abuse of discretion. The appellate court disagreed and the defendants appealed to the Ohio Supreme Court.

{¶ 43} The Ohio Supreme Court concluded that the trial court did not abuse its discretion by excluding the expert testimony. The court explained:

> "[The plaintiff] made a seasonable request in her interrogatories for [the defendants] to identify anyone who would be testifying as an expert witness. [The defendants] failed to name Dr. Brooks in their response. * * * *
>
> [The defendants'] actions demonstrated a disregard for the orders of the trial court and for the rules and structure of our adversarial process."

Id. at ¶¶26-27.

{¶ 44} In Mynes v. Brooks, 4th Dist. Scioto No. 08CA3211, 2009-Ohio-5017, we determined that the trial court did not abuse its discretion by excluding an expert's testimony when the proponent did not disclose the witness as an expert witness until eleven days before trial, well after the court's deadline for discovery had passed.

{¶ 45} In Wright v. Structo, Div. of Eljir Mfg., Inc., 88 Ohio App.3d 239, 623 N.E.2d 694 (6th Dist. 1993), the court also determined that the trial court did not abuse its discretion by excluding expert testimony. In Wright, the plaintiffs filed a negligence complaint against the defendants. One of the defendants subsequently filed a motion in limine to exclude the plaintiffs' expert witness's testimony. The defendant asserted that the plaintiffs failed to respond to its requests to depose the witness. The defendant had formally and informally requested to depose the expert witness but was never given an opportunity to do so. Additionally, the plaintiffs had not disclosed the expert witness within sixty days of the trial date, but rather only six weeks before the trial date. The trial court granted the defendant's motion in limine and precluded the plaintiffs from presenting their expert witness's testimony at trial. The trial court consequently dismissed the case because the plaintiffs could not, without the expert's testimony, establish a prima facie case.

{¶ 46} On appeal, the court concluded that the trial court did not abuse its discretion by excluding the expert testimony, even though it resulted in a dismissal of the plaintiffs' case:

"Upon a review of the facts of this case, we find that appellants have failed to demonstrate that the trial court abused its discretion when it barred their expert's testimony.   Appellants' failure to cooperate in the discovery process prohibited appellees from fully developing their defense and preparing for cross-examination.   The decision to dismiss appellants' case was proper in light of the fact that appellants had no expert testimony to support their case."

Id. at 245.

{¶ 47} In the case sub judice, we do not believe that the trial court abused its discretion by precluding appellant from presenting expert testimony at trial.   Just as in Vaught, in the case sub judice appellees made a seasonable request in their interrogatories for appellant to identify anyone who would be testifying as an expert witness.   In May 2009, appellant responded to PCC's interrogatory to identify expert witnesses and stated: "Not known at this time.   May possibly call experts in surgery, critical care, economics.   Will supplement."   Appellant did not supplement her answer.   Indeed, appellant refused appellees' demands in March, April, and May 2010 to identify her experts so that they could schedule the depositions.   Appellant then indicated that she would be able to disclose her experts by mid-June.   She did not.   Appellant did not disclose her experts until thirty days before trial.   These actions clearly disrupted the free flow of information between the parties and warranted sanctions for her failure to timely respond to inquiries.   Jones, 12 Ohio St.3d at 86.   Appellant's failure to cooperate in the discovery process prohibited appellees from fully developing their defense and preparing for cross-examination.   Wright, 88 Ohio App.3d at 245.

{¶ 48} Moreover, at the December 17, 2010 hearing, appellant recognized that the parties were required to complete depositions sixty days before trial.   Appellant's counsel stated: "The only clear orders were that there was an end point for doing depositions and then afterwards we would select among those and report to the Court whose–who were going to be our experts."

Appellant, however, does not explain how she believed the appellees would be able to complete depositions of her experts sixty days before trial (November 19, 2010) if she refused to disclose them until thirty days before trial (December 19, 2010). As Romanello aptly indicated in his April 16, 2010 email: "Obviously, [the parties] cannot be taking discovery depositions of * * * expert witnesses up to 30 days before trial."

{¶ 49} Appellant claims that appellees caused the predicament by failing to demand on June 1, 2010 that appellant disclose her experts. Appellant fails to acknowledge, however, that in March, April, and May of 2010, appellees did demand that appellant disclose her experts. In March, Popham first raised a concern that the parties would not be able to complete expert depositions if they waited until thirty days before trial to disclose them. Popham suggested that the parties agree to a modified discovery schedule. All parties approved except appellant. Appellant's counsel agreed to discuss it further, and suggested that the parties discuss a revised schedule at the end of May 2010. For whatever reason, that discussion did not occur.

{¶ 50} In April 2010, Willard informed appellant that the parties had reached "the point in which the discovery depositions of your experts * * * needs to be undertaken. Please provide available dates at your earliest convenience for each of these experts." Also in April, Romanello (PCC) requested to schedule appellant's experts' depositions in May, June, and July.

{¶ 51} Appellant responded that she hoped to disclose her experts by mid-June, at which point she expected appellees would advise how many experts they intended to call. Appellant believed that once she and appellees had disclosed their respective expert witnesses, then the parties could set a deposition schedule. By mid-June, however, appellant had failed to disclose any expert witnesses.

{¶ 52} While appellant blames the appellees for failing to raise the issue of expert witness disclosure between May 2010 and November 2010, we believe that appellant shares at least equal or greater blame. Appellant was the only party who did not agree with the revised discovery schedule and stated that she wanted to discuss it further. Appellant indicated that the parties could discuss a deposition schedule either at the end of May or once she disclosed her experts in mid-June. Neither event occurred. Appellant placed the ball in her court by refusing to agree to the modified schedule, by stating that she wanted to discuss it further, and by stating that the parties could discuss a deposition schedule once she disclosed her experts–"hopefully by mid-June." Because appellant failed to disclose her experts by mid-June, the parties did not discuss a deposition schedule. Obviously, without knowing who appellant intended to call as experts, there was nothing to discuss.

{¶ 53} For whatever reason, appellant chose not to disclose any expert witnesses within a reasonable time before trial so as to enable appellees to depose them. Thus, we cannot conclude that trial court abused its discretion by determining that appellant failed to comply with Civ.R. 26(E)'s requirement to seasonably supplement her answers to appellees' interrogatories. Appellant's continued failure to disclose her expert witnesses hampered appellees' ability to prepare an effective defense.

{¶ 54} Additionally, appellant's arguments regarding ex parte communications and the Ohio Supreme Court's two-year guideline do not negate appellant's failure to seasonably supplement her interrogatory responses. Under Civ.R. 26(E), appellant had a duty to seasonably supplement her interrogatory responses. She failed to do so. Also, assuming, arguendo, that appellees engaged in an ex parte communication with the trial court, or that the trial court had a policy of not continuing a case beyond the two-year guideline, the fact remains that appellant did not comply with Civ.R. 26(E)(1)(b). Similarly, even if appellees could arguably share some

blame for failing to continually hound appellant to disclose her experts, the fact again remains that appellant did not comply with Civ.R. 26(E)(1)(b).   Because appellant failed to comply with Civ.R. 26(E)(1)(b), the trial court had discretion to preclude appellant from offering expert testimony at trial.   In view of the length of time that elapsed between the time when appellant first filed complaints against appellees (2007) and when appellant disclosed her experts (December 2011), we cannot state that the trial court abused its discretion by precluding expert testimony rather than continuing the case.   The trial court rationally could have concluded that over the course of those years, appellant should have known the names of her expert witnesses and should have disclosed their identity well before December 2011.   Under the facts present in the case sub judice, appellant's disclosure of her expert witnesses thirty days before trial did not fulfill her duty to seasonably supplement her interrogatory responses.

{¶ 55}  We further disagree with appellant that the trial court displayed bias or hostility sufficient to undermine our conclusion that the court did not abuse its discretion.

> "Judicial bias has been described as 'a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.'   State ex rel. Pratt v. Weygandt (1956), 164 Ohio St. 463, 58 O.O. 315, 132 N.E.2d 191, paragraph four of the syllabus.
> In Liteky v. United States (1994), 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474, the Supreme Court held that 'opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.   Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.'   On the other hand, '[t]hey may do so [support a bias challenge] if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.' (Emphasis sic.) Id."

State v. Dean, 127 Ohio St.3d 140, 2010-Ohio-5070, 937 N.E.2d 97, ¶¶47-48.

> "A trial judge is presumed not to be biased or prejudiced, and the party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity.  Corradi v. Emmco Corp. (Feb. 15, 1996), Cuyahoga App. No. 67407, unreported, 1996 Ohio App. LEXIS 510, at 9, citing State v. Wagner (1992), 80 Ohio App.3d 88, 93, 608 N.E.2d 852; citing State v. Richard (Dec. 5, 1991), 1991 Ohio App. LEXIS 5772, Cuyahoga App. No. 61524.   Bias against a party is difficult to question unless the judge specifically verbalizes personal bias or prejudice toward a party.   In re Adoption of Reams (1989), 52 Ohio App.3d 52, 59, 557 N.E.2d 159."

Frank Novak & Sons, Inc. v. Brantley, Inc., 8th Dist. Cuyahoga No. 77823 (Mar. 29 ,2001)

{¶ 56}  In the case sub judice, the December 17, 2010 hearing transcript does not show that the trial judge displayed any "deep-seated favoritism or antagonism that would make fair judgment impossible."   Although the trial court judge may have exhibited frustration with appellant's counsel, such "critical or disapproving" remarks do not, standing alone, support a bias or partiality challenge.

{¶ 57}  Accordingly, based upon the foregoing reasons, we hereby overrule appellant's first and second assignments of error.

II

{¶ 58}  In her third assignment of error, appellant asserts that the trial court's failure to grant her motions to reconsider Judge Marshall's decision that precluded her from presenting expert testimony at trial constitutes reversible error.   Appellant argues that the trial court incorrectly determined that the "law of the case" doctrine prohibited it from disturbing Judge Marshall's decision.   She further alleges that Judge Marshall's decision was "tainted by an ex parte conversation between counsel and the Judge" and, thus, "must be vacated."

{¶ 59} Generally, a trial court has plenary power to entertain a motion for reconsideration prior to entering a final judgment. Vanest v. Pillsbury Co., 124 Ohio App.3d 525, 535, 706 N.E.2d 825 4ᵗʰ Dist. 1997). Thus, absent an abuse of discretion, a reviewing court will not reverse a trial court's decision regarding a motion for reconsideration. Id. Again, an abuse of discretion connotes more than an error of law or judgment; rather, an abuse of discretion indicates an unreasonable, arbitrary, or unconscionable attitude. E.g., AAAA Enterprises, Inc. v. River Place Community Redevelopment Corp., 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). Moreover, an abuse of discretion will not be found simply because a reviewing court could reach a different opinion were it deciding the issue de novo. E.g., In re Jane Doe I, 57 Ohio St.3d 135, 137-138, 566 N.E.2d 1181 (1991).

{¶ 60} In the case sub judice, we do not believe that the trial court's decision to overrule appellant's motions to reconsider the prior order that precluded her from presenting expert testimony at trial constitutes an abuse of discretion. The trial court could have reasonably and rationally determined that vacating the prior order was not warranted under the facts.

{¶ 61} As we discussed under appellant's first and second assignments of error, the record amply shows that appellant did not comply with Civ.R. 26(E)(1)(b). Appellees' interrogatories requested appellant to identify the expert witnesses she intended to call at trial. In May 2009, appellant disclosed that her experts were unknown, but that she would "supplement." Appellant, however, did not supplement her answer. Instead, appellant waited until thirty days before trial (December 20, 2010) to disclose her expert witnesses, despite her continuing duty to supplement her interrogatory responses. The trial court reasonably could have determined that the passing of approximately one and one-half years between appellant's assertion that she would supplement her interrogatory responses and her actual disclosure was

not seasonable. Thus, the trial court did not abuse its discretion by failing to set aside Judge Marshall's prior order.

**{¶ 62}** Appellant nevertheless asserts that the trial court incorrectly applied the law-of-the-case doctrine. However, even if the trial court improperly relied upon the law of the case doctrine, we may not reverse a correct judgment simply because a trial court may cite incorrect reasons. "[I]t is the definitely established law of this state that where the judgment is correct, a reviewing court is not authorized to reverse such judgment merely because erroneous reasons were assigned as the basis thereof." Agricultural Ins. Co. v. Constantine, 144 Ohio St. 275, 284, 58 N.E.2d 658 (1944); accord State ex rel. Carter v. Schotten, 70 Ohio St.3d 89, 92, 637 N.E.2d 306, 309 (1994); Joyce v. General Motors Corp., 49 Ohio St.3d 93, 96, 551 N.E.2d 172 (1990). Thus, when a trial court has stated an erroneous basis for its judgment, an appellate court must nevertheless affirm the judgment if it is legally correct on other grounds. Reynolds v. Budzik, 134 Ohio App.3d 844, 846, 732 N.E.2d 485, fn. 3 (6th Dist. 1999); Newcomb v. Dredge, 105 Ohio App. 417, 424, 152 N.E.2d 801 (2nd Dist. 1957) ("It is the duty of the reviewing court to affirm the judgment if it can be supported on any theory, although a different theory from that of the trial court.").

**{¶ 63}** In the case at bar, we believe the trial court's judgment is legally correct on other grounds, i.e., the court did not abuse its discretion by denying appellant's motions to reconsider. As a general rule, trial courts may reconsider interlocutory orders prior to final judgment. Thus, even if in the case at bar the trial court assigned, in part, incorrect reasons for its judgment, we must nevertheless affirm it. We note that the second trial court judge to preside over this matter

also indicated his agreement with the substance of the prior trial court judge's (Judge Marshall's) decision.

**{¶ 64}** Furthermore, we do not agree with appellant that Judge Marshall's prior order was "tainted by an ex parte conversation." Instead, as we explained, the prior order resulted from appellant's failure to comply with Civ.R. 26(E)(1)(b).

**{¶ 65}** Accordingly, based upon the foregoing reasons, we hereby overrule appellant's third assignment of error.

## III

**{¶ 66}** In her fourth assignment of error, appellant asserts that the trial court erred by entering summary judgment in appellees' favor. Appellant argues that she need not present expert medical testimony to prove her claims because her medical malpractice and lack of informed consent claims are within the "common knowledge" of laypersons.

## A

## STANDARD OF REVIEW

**{¶ 67}** An appellate court conducts a de novo review of trial court summary judgment decisions. E.g., Grafton v. Ohio Edison Co., 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Accordingly, appellate courts must independently review the record to determine whether summary judgment is appropriate and need not defer to the trial court. Brown v. Scioto Cty. Bd. of Commrs., 87 Ohio App.3d 704, 711, 622 N.E.2d 1153 (1993); Morehead v. Conley, 75 Ohio App.3d 409, 411-412, 599 N.E.2d 786 (1991). Thus, to determine whether a trial court properly granted summary judgment, an appellate court must review the Civ.R. 56 standard for granting a summary judgment motion, as well as the applicable law. Civ.R. 56(C) provides:

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

{¶ 68} Consequently, trial courts may not grant summary judgment unless the evidentiary materials demonstrate that (1) no genuine issue as to any material fact remains to be litigated, (2) after the construing the evidence most strongly in the nonmoving party's favor, reasonable minds can come to but one conclusion, which is adverse to the nonmoving party, and (3) the moving party is entitled to judgment as a matter of law. E.g., Vahila v. Hall, 77 Ohio St.3d 421, 429-30, 674 N.E.2d 1164 (1997).

B

MEDICAL MALPRACTICE

"In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things."

Bruni v. Tatsumi, 46 Ohio St.2d 127, 346 N.E.2d 673 (1976), paragraph one of the syllabus;

Ramage v. Central Ohio Emergency Serv. Inc., 64 Ohio St.3d 97, 102, 592 N.E.2d 828 (1992);

Littleton v. Good Samaritan Hosp. & Health Ctr., 39 Ohio St.3d 86, 93, 529 N.E.2d 449 (1988).

{¶ 69} Proof of the recognized standards of care ordinarily must be provided through expert testimony. Bruni, 46 Ohio St.2d at 131-32. In Crosswhite v. Desai, 64 Ohio App.3d

170, 580 N.E.2d 1119 (2nd Dist. 1989), the court explained the underlying principle for requiring

expert testimony in a medical malpractice case:

> "It has long been the rule in most jurisdictions that in cases of medical malpractice, expert testimony is not merely permitted but required of the plaintiff to meet his burden of proof.   Commenting on the rule, Wigmore classifies medical malpractice as an issue of special experience concerning which testimony may be received only of a person of that special experience. * * *.   Absent that requirement, a plaintiff would prefer ' * * * to rest his case on the mere facts of his sufferings, and to rely upon the jury's untutored sympathies, without attempting specifically to evidence the defendant's unskillfulness as the cause of those sufferings.' Ohio has long followed suit, holding ' * * * that expert testimony is ordinarily needed to establish the requisite standard of care and skill a physician owes in his treatment of a patient.' Hoffman v. Davidson (1987), 31 Ohio St.3d 60, 62, 508 N.E.2d 958, 960-61 (citing Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, 346 N.E.2d 673)."

Id. at 174 (citations omitted).

**{¶ 70}** If "the plaintiff fails to present expert testimony that a physician breached the

applicable standard of care and that the breach constituted the direct and proximate cause of the

plaintiff's injury, a court may enter summary judgment in favor of the defendant-physician."

Armeni v. Aromatorio, 7th Dist. No. Mahoning App. No. 11MA48, 2012-Ohio-1500, ¶34, citing

Click v. Georgopoulos, 7th Dist. Mahoning No. 08MA240, 2009–Ohio–6245, ¶29–30; Korreckt

v. Ohio Health, 10th Dist. Franklin No. 10AP819, 2011–Ohio–3082, ¶12; Hitch v. Thomas, 6th

Dist. Lucas No. L–09–1292, 2010–Ohio-3630, ¶47; Nye v. Ellis, 5th Dist. Licking No.

09–CA–80, 2010–Ohio–1462, ¶38; Taylor v. McCullough–Hyde Memorial Hosp., 116 Ohio

App.3d 595, 599–600, 588 N.E.2d 1028 (12th Dist. 1996).

**{¶ 71}** A lack of informed consent claim also requires expert testimony:

> "The tort of lack of informed consent is a medical claim, and therefore expert medical testimony is required to establish both the material risks and dangers inherently and potentially involved with a medical procedure and that an

undisclosed risk or danger actually materialized and proximately caused injury to the patient * * *."

White v. Leimbach, 131 Ohio St.3d 21, 2011-Ohio-6238, 959 N.E.2d 1033, syllabus.

{¶ 72} In the case sub judice, appellant lacks expert testimony to present at trial to establish any elements of her medical malpractice or informed consent claims. Appellant contends, however, that her claims do not require expert testimony and, thus, that the trial court improperly entered summary judgment in appellees' favor. Appellant asserts that her claims involve matters within the common knowledge of laypersons, thus obviating the need for expert testimony.

{¶ 73} "[E]xpert testimony is unnecessary when 'the lack of skill or care of the physician * * * is so apparent as to be within the comprehension of laymen and requires only common knowledge and experience to understand and judge it[.]'" Rhoads v. Brown, 4th Dist. Highland No. 09CA18, 2010-Ohio-3898, ¶32, quoting Bruni, 46 Ohio St.2d at 130; accord Longbottom v. Mercy Hosp. Clermont, — Ohio St.3d —, 2012-Ohio-2148, 971 N.E.2d 379 (12th Dist. 2012), ¶32 (stating that "if a plaintiff's claims are well within the comprehension of laypersons and require only common knowledge and experience to understand them, the plaintiff is not required to present expert testimony to prove them"). Under the common knowledge exception, "matters of common knowledge and experience, subjects which are within the ordinary, common and general knowledge and experience of mankind, need not be established by expert opinion testimony." Ramage v. Central Ohio Emergency Serv., Inc., 64 Ohio St.3d 97, 103, 592 N.E.2d 828 (1992). A plaintiff must, however, present expert testimony when "the inquiry pertains to a highly technical question of science or art or to a particular professional or mechanical skill."

Jones v. Hawkes Hosp. of Mt. Carmel (1964), 175 Ohio St. 503, 196 N.E.2d 592, paragraph one of the syllabus.

{¶ 74} "The common knowledge exception has a limited scope in a world of increasing medical complexity."  Cunningham v. Children's Hosp., 10th Dist. Franklin No. 05AP-69, 2005-Ohio-4284, ¶20.   Thus, "'[r]elatively few courts in Ohio have found the common knowledge exception applicable so as to obviate the need for expert witness testimony on the malpractice issue.'" Id., quoting Buerger v. Ohio Dept. of Rehab. & Corr., 64 Ohio App.3d 394, 399, 581 N.E.2d 1114 (1989).

{¶ 75} Ohio courts generally have applied the common knowledge exception to cases involving "gross inattention during patient care or miscommunication with a patient."   Id. at ¶21, citing Lipp v. Kwyer, 6th Dist. Lucas No. L-02-1150, 2003-Ohio-3988, ¶14.   Courts have found "gross inattention" when "a patient suffered injury after a medical provider has left the patient unattended."   Id., citing Burks v. Christ Hosp., 19 Ohio St.2d 128, 131, 249 N.E.2d 829 (1969) (sedated, obese patient fell from hospital bed without side rails); Jones, 175 Ohio St. at 505 (delirious, restless, and pregnant woman fell while attempting to climb over side rails and out of bed after nurse left her unattended); LaCourse v. Flower Hosp., 6th Dist. Lucas No. L-02-1004, 2002-Ohio-3816, ¶16 (70-year-old, 270-pound patient who was paralyzed on her left side fell while allegedly left unattended and supported wholly by a walker); Dimora v. Cleveland Clinic Found., 114 Ohio App.3d 711, 718, 683 N.E.2d 1175 (8th Dist. 1996) (patient fell after student nurse left her unattended at her walker while opening a door); accord Krafty v. Firelands Community Hosp., 6th Dist. Erie No. E-07-19, 2007-Ohio-5302 (concluding that therapist using "wobble board" on a linoleum floor is an event within the common knowledge of the ordinary

person and does not require expert testimony).   Ohio courts also have applied the common

knowledge exception when the alleged negligence results from miscommunication between a

doctor and patient.   Cunningham at ¶21, citing Schraffenberger v. Persinger, Malik & Haaf,

M.D.s, Inc., 114 Ohio App.3d 263, 267, 683 N.E.2d 60 (1st Dist. 1996) (patient alleged that

doctor negligently and erroneously informed him that he was sterile following a vasectomy).

**{¶ 76}** In Rhoads, we determined that the common knowledge exception did not apply to

the plaintiff's negligence claims that arose after she suffered a collapsed lung.   In Rhoads, the

plaintiff filed a complaint against various medical providers after suffering a collapsed lung.

The plaintiff averred that before undergoing shoulder surgery, a nurse performed an interscalene

block to alleviate post-operative pain.   The plaintiff alleged that during the procedure, the nurse

punctured her lung and caused it to collapse.   The plaintiff complained of severe chest pain but

the medial providers failed to diagnose her collapsed lung.   After experiencing chest pain for

more than a week after the surgery, she called the doctor's office.   The physician's assistant told

the plaintiff to wait until her scheduled appointment two days later to talk to the doctor about her

chest pain.   At her appointment, the doctor ordered a chest x-ray but did not read it until later in

the day.   The plaintiff subsequently underwent surgery to re-inflate the lung.

**{¶ 77}** In her complaint, the plaintiff alleged that the nurse negligently placed the

interscalene block and that the medical providers negligently failed to diagnose and treat her

collapsed lung.   She further alleged that the doctor negligently supervised the physician's

assistant who instructed her to wait two days to discuss her chest pain with the doctor.

**{¶ 78}** The defendants filed summary judgment motions and asserted that the plaintiff

lacked expert testimony to prove that they breached the standard of care or proximately caused

her injuries.   The trial court agreed that the plaintiff lacked expert testimony to establish that the

medical providers deviated from the standard of care or proximately caused her injuries.   The

court thus entered summary judgment in the defendants' favor.

{¶ 79} On appeal, the plaintiff argued, in part, that she did not need to present expert

testimony to establish that the medical facility negligently supervised or trained its nurses or that

the doctor negligently supervised or trained the physician's assistant because the nurses' and the

physician assistant's lack of skill or care fell within the common knowledge exception.   We

disagreed.   With respect to the nurses' alleged lack of skill or care, we explained:

> "[I]t requires more than common knowledge to conclude that a patient
> who received an interscalene block in anticipation of shoulder surgery and who
> complains of chest pain is suffering from [a collapsed lung] or otherwise
> experiencing a noteworthy symptom.   [The plaintiff's] claim squarely challenges
> the professional skill and judgment of the nursing staff in assessing whether her
> chest pain was significant in relation to her physician's task of diagnosing and
> treating her.   Therefore, to maintain an action against [the medical facility] for
> negligent training or supervision, [the plaintiff] needed expert testimony to
> establish the nursing staff's wrongdoing."

Id. at ¶17.

{¶ 80} We further rejected the plaintiff's assertion that the physician assistant's

negligence in advising her to wait two days to talk to the doctor about her chest pain fell within

the common knowledge exception.   We determined that "[t]he appropriateness of [the physician

assistant's] advice involves the exercise of judgment or skill of a physician's assistant and is not

within the common knowledge of jurors."   Id. at ¶36.   We thus rejected the plaintiff's argument

that she did not need to present expert testimony to show that the physician assistant's conduct

fell below the applicable standard of care.

{¶ 81} We also disagreed with the plaintiff that the doctor's alleged negligence in waiting to read the chest x-ray fell within the common knowledge exception. We concluded that the doctor's

> "lack of skill or care in this situation is [not] so apparent as to be within the common knowledge of the jury. It is not common knowledge that a patient who complains from chest pain under these circumstances is suffering from [a collapsed lung] or requires such urgent medical attention that a physician acts negligently if several hours elapse before the patient's chest x-ray is read."

Id. at ¶37.

{¶ 82} In Dimora, the court determined that the plaintiff was not required to present expert testimony to establish negligence. In Dimora, the patient had a history of balance difficulties and used a walker. A student nurse left the patient unattended while the nurse opened the bathroom door. The appellate court determined that whether the student nurse acted negligently was "clearly within the common knowledge and experience of jurors, not requiring knowledge beyond the ken of the layperson, and, therefore, expert testimony is not required." Id. at 719.

{¶ 83} In Jones, the court determined that the plaintiff's allegation that the nurses negligently left the plaintiff—a woman in advanced labor—alone for one to five minutes, during which time she fell from the bed, was within the common knowledge of laypersons. In Jones, the plaintiff was "drowsy, lethargic, delirious, and restless" and had "made several attempts" to climb out of the bed. Id. at 505. In explaining its reasoning for concluding that the common knowledge exception applied, the court stated:

> "It seems quite clear that the average juror from his own personal knowledge would be able to conclude that an expectant mother, delirious, drugged, restless and determined to climb out of her bed, would in all probability succeed unless she was closely supervised. Surely no testimony is necessary to

establish cause and effect under the circumstances presented by the undisputed evidence in this case.

The court may take judicial notice that juries of today include women. Many of these woman jurors are mothers and, in many instances, grandmothers. In the case at bar, there were six women. They know probably as much if not more about childbirth than many experts who might be put on the witness stand.

The jury, unaided by the opinion of experts, was sufficiently equipped with knowledge gained from everyday life to consider the facts and to return a verdict supported by competent evidence of proof of negligence proximately causing appellant's injuries."
Id. at 507.

{¶ 84} In the case sub judice, we do not agree with appellant that her negligence allegations fall within the common knowledge exception. Appellant's brief asserts that the common knowledge exception applies because

"Dr. Olukoga did not obtain informed consent from Mrs. Merrill on December 6, 2005, nor is there documented informed consent on or after December 29, 2005; and Dr. Olukoga misrepresented that [Mrs. Merrill] already had 'clearance.' Likewise, the common knowledge exception applies with regard to the failure of the SOMC nurses to prevent Bonnie from falling out of bed on January 31, 2006."

Appellant does not expand upon these arguments, but instead references her memorandum contra appellees' summary judgment motions. Appellant's memorandum contra, however, does not sufficiently explain how her lack of informed consent claim falls within the common knowledge exception. We believe far more than common knowledge is required to establish "the material risks and dangers inherently and potentially involved with [Mrs. Merrill's three-part surgical procedure] and that an undisclosed risk or danger actually materialized and proximately caused injury to [Mrs. Merrill]." The allegations that surround appellant's informed consent claim do not involve "subjects which are within the ordinary, common and general knowledge and experience of mankind." Consequently, the common knowledge exception does not apply to appellant's lack of informed consent claim. Instead, appellant needed to present expert testimony to establish her lack of informed consent claim.

{¶ 85} Likewise, appellant's memorandum contra does not adequately explain how the nurses' alleged negligence falls within the common knowledge exception.   She contended that based upon Merrill's status, "common sense * * * would require [a fall assessment.]"   Whether the nurses should have exercised better professional judgment and performed a fall assessment is not a matter of common knowledge.   The failure to perform a fall assessment is not a "subject * * * within the ordinary, common and general knowledge and experience of mankind."   Instead, whether to perform a fall risk assessment is a medical decision.   See Wagner v. Fairview General Hosp., 8th Dist. Cuyahoga No. 54168 (Aug. 4, 1988) (determining that decision whether to use a restraining belt to secure patient to bed involves a medical decision beyond a jury's common knowledge and therefore requires expert testimony to establish standard of care applicable).   Thus, appellant needed to present expert testimony to prove the standard of care applicable to her medical malpractice claim.

{¶ 86} Additionally, appellant fails to explain how any alleged breach of the standard of care regarding the fall risk assessment proximately caused Merrill's injuries.   Appellant states that Merrill's cause of death was respiratory failure caused by encephalopathy.   Whether Merrill's fall proximately caused her death is not a matter within the common knowledge of laypersons.   Instead, expert testimony is required to show that the fall proximately caused Merrill's death

{¶ 87} Once again, we believe that none of the physicians' or medical providers' alleged failures fall within the common experience of a layperson.   Unlike Dimora and Jones, appellant's complaint involves more than gross inattention or miscommunication.   Appellant's complaint alleged that the physicians and medical providers "were professionally negligent and

fell below the standard of care of ordinary, skillful and prudent medical and surgical physicians, nurses and other healthcare providers." Appellant further alleged that appellees "failed to fully inform [Merrill] of the risks inherent in their treatment plan and management of her medical and surgical conditions." Similar to Rhoads, appellant's complaint challenges the professional skill, care, and judgment of the various physicians and medical providers in relation to her care, surgery, and informed consent.

{¶ 88} Therefore, because appellant lacked expert testimony to prove any of her claims, the trial court appropriately entered summary judgment in appellees' favor.

{¶ 89} Accordingly, based upon the foregoing reasons, we hereby overrule appellant's fourth assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellees shall recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Harsha, J. & *Fischer, J.: Concur in Judgment & Opinion

For the Court

BY:_____
Peter B. Abele, Judge

**NOTICE TO COUNSEL**

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.

*Judge Patrick Fischer, First District Court of Appeals, sitting by assignment of the Ohio Supreme Court in the Fourth Appellate District.